THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

SUNG MO JUN, JUNWOO CHON,
JOON JUN, and AYDEN LEE,

Defendants.

No. 2:21-cr-00135 RAJ

**DEFENDANT JOON MO JUN'S
SENTENCING MEMORANDUM**

## Table of Contents

I. INTRODUCTION................................................................................................3

II. JOON'S BACKGROUND AND CHARACTER.............................................5

  A.  Joon's Impoverished and Unstable Childhood in South Korea (1975-1991).................5

  B.  Poverty In a Different Place: Joon and His Brother's Move to the United States, and Are Left to Fend for Themselves (1991-1997)........................................8

  C.  Joon Finds Stability and Satisfaction at Microsoft—and Is Then Laid Off After Twenty Years of Service (1997-2017)........................................11

  D.  Joon's Marriage and Family Life ........................................13

  E.  In 2014, A Tragic Accident Forever Changes Joon's and Jeong-Ju's Lives.................15

  F.  Joon Loses His Job at Microsoft (2015-2017) ........................................16

  G.  Joon Begins to Day Trade to Generate Income and Support His Wife.........................18

  H.  Aftermath/Future ........................................19

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

III. RECOMMENDED SENTENCE .......................................................................21

IV. JUSTIFICATION FOR SENTENCING RECOMMENDATION ...................21

   A.  Rehabilitation ........................................................................................22

   B.  Deterrence and Protection of the Public .............................................24

   C.  A Three Year Probationary Sentence With Six Months Home Detention Is a Just Sentence. ................................................................................................26

   D.  The Recommended Sentence is in Accord with the Sentences This Court Has Already Imposed in This Case .................................................................................27

V. CONCLUSION ..............................................................................................28

## Table of Authorities

**Cases**

*California v. Brown*, 479 U.S. 538, 545 (1987) ...........................................................3

*Dean v. United States*, 137 S. Ct. 1170, 1175 (2017)...............................................21

*Securities and Exchange Commission v. Angela Milliard et al.*, Civil Action No. 12-73-M-DLC (D. Montana filed May, 2020)..........................................................26

*Securities and Exchange Commission v. David M. Otto, Todd Van Siclen, et al.*, Civil Action No. 2:09-cv-0960 RAJ (W.D. Wash. filed July, 2009) .........................26

*Securities and Exchange Commission v. Ken C. Chow*, et al., (Case No. C-01-21067 JW) (N.D. Cal. Filed Nov. 2001) .......................................................................26

*Securities and Exchange Commission v. Kenneth Peer*, No. 2:17-cv-01865 (W.D. Wash. filed Dec., 2017) ..................................................................................26

*Securities and Exchange Commission v. Kirk Sperry and Sperry and Sons Capital Investments, LLC*, No. 2:20-cv-01337 (W.D. Wash. filed Sept., 2020)..............26

*Williams v. People of State of N.Y.*, 337 U.S. 241 (1949) ...........................................3

**Statutes**

§ 3553 ...........................................................................................................................26

**Other Authorities**

Barack Obama, The President's Role in Advancing Criminal Justice Reform, 130 Harv. L. Rev. 811, 865–66 (2017)...............................................................................28

Jessica M. Eaglin, Constructing Recidivism Risk, 67 Emory L.J. 59 (2017) ...........24

Kevin I. Minor et. al., *Recidivism Among Federal Probationers-Predicting Sentence Violations*, Fed. Probation 31, 35 (2003) ..............................................................24

Melissa Hamilton, Back to the Future: The Influence of Criminal History on Risk Assessments, 20 Berkeley J. Crim. L. 75 (2015) ...................................................24

Jessica M. Eaglin, Constructing Recidivism Risk, 67 Emory L.J. 59, 83 (2017)......24

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

# I. INTRODUCTION

Nearly three quarters of a century ago the Supreme Court recognized that "punishment should fit the offender and not merely the crime." *Williams v. People of State of N.Y.*, 337 U.S. 241, 247 (1949). As Justice O'Connor explained:

> [E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.

*California v. Brown*, 479 U.S. 538, 545 (1987).

There is no question that, unlike his co-defendants, Joon's criminal acts are attributable to both a disadvantaged background, and longstanding emotional and mental problems. Dr. George Woods -- a leading neuropsychiatrist, law professor at the University of California, Berkley School of Law, and current President of the International Academy of Law and Mental Health, -- has examined Joon, interviewed Joon's wife, and reviewed volumes of documents related to the case, including letters of support, the Plea Agreement, and the Presentence Report. He submitted his expert evaluation of Joon in a report to the Court. *Report of Dr. George Woods* (Mar. 14, 2022) (hereinafter "***Exhibit A***").

Unlike the defendants in this case whose actions were driven principally by personal greed, Dr. Woods found Joon's actions to be the product of a complex of factors, including:

- Lifelong mental illness;
- A complex dependence on his older brother borne both by manifestations of Korean culture and by his total reliance on him as a teen, after having been virtually abandoned by his parents in a foreign country in which he had profound language deficits;
- Financial desperation from losing his job of twenty years (the only job he had ever known) and finding himself without prospects for other work due to the uniqueness of his job skills and his significant language deficits; and
- His profound sense of responsibility as the sole caregiver for his disabled wife.

DEFENDANT'S SENTENCING MEMORANDUM – Page 3
No. 2:21-cr-00135-RAJ

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

As Dr. Woods summarized in his report to the Court:

At the time of the offense, Joon was experiencing one of the most destabilizing periods of his life. He had recently lost his job of twenty (20) years at Microsoft. His job was inextricably tied to his native language and Korean culture, that were the bedrock of Joon's life. His wife had been involved in a serious accident that required ongoing medical care and monitoring. Mr. Joon continues to be her caregiver, providing his wife with the ongoing, direct care and emotional support she requires. The support he willingly gives her has created what is known in the clinical literature as caregiver burden. It carries significant stressors which prey on Joon's depressive vulnerability.

Joon's major depressive disorder undermined his ability to adequately weigh and deliberate the business offers his older brother made to him, as well as the problems they could potentially create for him and his family. The loss of his job, which included the loss of income and the family's medical insurance, as well as the supportive work environment and multiple friends and colleagues, mirrors the loss of his church and the support Joon experienced through it when his family immigrated from South Korea. The loss of support deepened his depressive symptoms. His termination also resulted in the loss of a primary source that fed his sense of self-esteem and self-worth. Joon's capacity to make good decisions was diminished due to family pressures, as well as the personal vulnerability created by the severity of his depression. As he had in his childhood, he turned to his older brother for support and guidance. This was a culturally prompted response. Each of these factors played a part in his regrettable, once-in-a-lifetime decision, which led to the charges he currently faces.

*Exhibit A* at 1-2.

Dr. Woods's report makes clear that Joon's conduct, while not excusable – and importantly he makes no excuses and, indeed, is profoundly remorseful and has preserved and made available to the Court the full amount of forfeiture he owes – is explained by the once-in-a-lifetime economic and emotional stress he was under when he broke the law. This manifestly differentiates him from others who participated in this offense, and his sentence should be

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

manifestly different too.  We urge the Court to impose a three year probationary sentence with six months' home detention.[1]

## II.   JOON'S BACKGROUND AND CHARACTER

### A.   Joon's Impoverished and Unstable Childhood in South Korea (1975-1991)

Joon was born in Seoul, South Korea, on October 27, 1975.  At birth, he was diagnosed with a genetic condition—called Infantile Hypertrophic Pyloric Stenosis—which prevented him from properly digesting food as an infant. *See Presentence Report* (hereinafter "PSR") at ¶ 78.  Today, in the United States, this condition is easily treatable with surgery, but in 1975, in South Korea—a country that was then unrecognizable from the tech hub the nation has become today—this was a near-death sentence for an impoverished family like Joon's.

Below is a photo of Joon when he was around three-years-old and his mother—this photo was taken in the late 1970s in South Korea (and illustrates the world into which he was born):

---

[1] Importantly, the Probation Department's sentencing recommendation of 14-months incarceration was made without benefit of the mitigating evidence Joon presents to the Court today, including Joon's many letters of support and the report of Dr. George Woods.  It would be extraordinary if this significant mitigating evidence had no effect on the resulting sentence.

DEFENDANT'S SENTENCING MEMORANDUM – Page 5
No. 2:21-cr-00135-RAJ

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900



Joon's feeding disorder rendered even more difficult a family life already challenged by extreme poverty.  The family had little money, but regularly bought expensive medicines to treat Joon's condition (to no avail).  Joon's mother later told him that nursing or feeding him was a terrifying proposition because he would vomit or choke on everything he ate.  To combat these responses, Joon's mother would hold him upside down (or hold his head and body in a static position) for hours at a time if Joon vomited to clear his airways.

In addition to weathering the difficulties presented by Joon's feeding disorder, Joon's parents struggled mightily to put food on the table.  *See PSR* at ¶ 53. Joon's mother did not work outside the home, as caring for Joon and his older brother Sung Mo was very much a full-time job.  Joon's father made a subsistence wage working as a ticket agent for Japan Airlines.

Joon's father's modest income was insufficient to meet the family's basic needs, and the family frequently ran out of food at the end of each month, as Joon's father awaited his monthly paycheck.  *See PSR* at ¶ 54. Joon has searing memories of his mother begging

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1
2
3

neighbors and storeowners for small bags of rice. *Id.* While Joon's mother was committed to doing whatever she had to do to keep her children alive, the fact that she was reduced to begging for food brought her and the family great shame.

4
5
6
7
8

Due to his feeding disorder and his family's poverty, Joon grew up malnourished, and his growth was stunted. *See PSR* at ¶ 55. We attach below a photo of Joon with his brother (and co-defendant), Sung Mo Jun, who is four-years older. The height difference is apparent, and has continued to the present day, as Sung is 5'11, while Joon is 5'6.

9
10
11
12
13
14
15
16
17
18



19
20
21
22
23
24

It is no surprise that virtually all Joon's memories of his childhood in South Korea are suffused by the anxiety and fear that came from being hungry and poor. For instance, when he was nine-years-old, Joon recalls the family being forced out of one apartment into an even smaller and cheaper apartment. Joon described the new apartment as so small that a queen sized bed would not fit in either room. *See PSR* at ¶ 53. In another instance, one family apartment was so small that his father had to use the restroom sitting sideways. Joon shared

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

one of the tiny bedrooms with his brother.  But the family lost that apartment, too, and ended up moving at least seven or eight more times before Joon turned sixteen.

Not surprisingly, Joon's family's instability and frequent relocations made it difficult for him to develop meaningful relationships with his peers at school. Other children bullied him, taking advantage of his small size and introverted personality. *See PSR* at ¶ 54. As a result of these environmental stressors, Joon frequently experienced as a child what he now recognizes as depression—a condition that would continue to afflict him for the rest of his life.  *See PSR* at ¶ 60.

**B.  Poverty In a Different Place: Joon and His Brother's Move to the United States, and Are Left to Fend for Themselves (1991-1997)**

In 1991, weary of the grinding struggle to live and eat that they faced in Seoul, Joon's family travelled to the United States, seeking a better life.  Joon's parents had some family in Tacoma, so the family travelled there.  *See PSR* at ¶ 57.  At the time, Jun was sixteen years old and did not speak a word of English.

Like many distressed immigrants who flee their home countries, the family had no plan beyond daily survival.  Both parents looked for work, but were unable to find jobs.  After a month of fruitless job searching, the family needed an income, so Joon's father returned to Seoul, and his low-paying job with the airline.  Three months later, unable to find work herself, Joon's mother returned to Seoul to care for her husband.

The end result of this upheaval was that by the fall of 1991, Joon was a sixteen-year-old boy living without his parents in a strange country.  He did not speak English and he had no means of economic support.  Left to fend for themselves, the brothers lived alone in a small

DEFENDANT'S SENTENCING MEMORANDUM – Page 8
No. 2:21-cr-00135-RAJ

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

apartment in Tacoma. Their mother would visit the U.S. every six months or so to check on them, but by and large the two boys were on their own.

The brothers tried to survive on the little money their parents sent them. Bereft of their parents, Joon's older brother assumed the role of father-figure and Joon's caretaker. And Joon very much required caretaking. *See PSR* at ¶ 59. As Dr. Woods explains:

> Joon became severely depressed. He would come home from school and lay on the sofa for four (4) or five (5) hours at a time. He was frequently suicidal throughout high school and college. . . . Joon relied upon his older brother more and more during this critical period of development. In spite of Sung's support, [Joon] was never really able to hold his own. As time passed, Joon became more withdrawn and increasingly dependent upon his brother, who had become his legal guardian in his parents' absence.

***Exhibit A*** at 6-7.

His brother also managed their finances, such as they were. Joon's father had to pay for apartments in Tacoma and Seoul, which left very little money to send to his kids. When Joon and his brother did not have enough money for groceries, they would go to a local factory outlet and purchase discounted old loaves of bread. *Id*. They would subsist together on these loaves for weeks.

Joon forced himself to attend Clover Park High School in Lakewood, Washington, even though he spoke no English, and was already a shy and reclusive teenager. Dr. Woods's report to the Court notes:

> The situation was further complicated because Joon was unable to speak English very well. He could read and understand the language, but he had not learned to speak English effectively. Joon feared his language deficits would create a barrier that would prevent him from making friends in high school. Social interactions were more difficult for him than his brother, who was more outgoing and socially skilled than he was. He brother's language skills were

**CORR CRONIN** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

also much better.  Sung was able to make friends and participate in various activities at school.  In contrast, Joon relied upon Sung on many levels.

***

He followed every one of Sung's recommendations, yet he often could not rise up to his older brother's abilities or meet his expectations.  Joon struggled with the English language.  He was unable to become part of the new society as easily as his brother.  This increased Joon's admiration for Sung even more.  He strived to follow Sung's guidance closely.

**Exhibit A** at 5.[2]

Joon's dependence on his brother had another important source.  Age hierarchy among siblings is a powerful aspect of Korean cultural identity.  Dr. Woods's report quotes a scholarly work that notes "[t]he older sibling's authority derive[s] from the age-based Korean family hierarchy..."  **Exhibit A** at 6, quoting Cho (2018).  The influence of this cultural deference was of obvious importance at this impressionable and vulnerable time of Joon's life, but Joon's deference to his brother never waned; if anything, it took on an even greater significance throughout his adult life as a consequence of his near-total dependence on his older brother when he was a teenager.

Suffering from severe depression in high school, Joon found comfort and refuge in a local Korean church called The House of Prayer. *See PSR* at ¶ 60. There, Joon met and was counseled by Ho Sook Kim, the church's minister.  He credits her with saving his life, for as Dr. Woods reports, Joon was suffering severe depression and experiencing suicidal ideations at the time. *Id*. Ms. Kim remembers Joon as a reserved and kind – but also troubled -- teenager:

---

[2] Joon's English skills are adequate now, but he still is self-conscious about his perceived inadequacy as an English speaker.

DEFENDANT'S SENTENCING MEMORANDUM – Page 10
No. 2:21-cr-00135-RAJ

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

[Joon] was never an outgoing, take-charge person. Always reserved, he spent his youth pondering life more than his peers. Though he had inward troubles in his heart, he was never a person who would cause troubles with other people nor harm anyone.

**Exhibit B***, Letter of Ho Sook Kim* at 1.

Thanks in large part to the care and attention Joon received from his brother and Mrs. Kim, Joon gradually made a place for himself in his new country.  He graduated from Clover Park High School in 1994, and then attended Shoreline Community College, where Joon earned an Associate Degree in 1997.  *See PSR* at ¶ 62.

**C.  Joon Finds Stability and Satisfaction at Microsoft—and Is Then Laid Off After Twenty Years of Service (1997-2017)**

After earning his Associate's Degree, Joon found a temporary contract position working at Microsoft.  Joon regards getting a temporary job at Microsoft in 1997 as a key turning point in his life.  *See PSR* at ¶ 63. He worked tirelessly (and quite happily) for Microsoft from 1997 until he was laid off in 2017.  *See PSR* at ¶ 72.

As an initial matter, the job provided financial stability, and helped allay Joon's omnipresent fear that he would return to the poverty-stricken days of his youth.  But even more importantly, the job supplied him with a social network and sense of meaning that had been heretofore missing from his life, a group of peers with whom he shared a common purpose.  *Id.*

Joon's fluency in the Korean language was instrumental in landing his job at Microsoft and, for once, his English speaking deficits were not a barrier to his success.  Joon's job was what is known in the industry as "localization:" the arduous task of translating software from English into another country's native language.  Microsoft hired Joon to translate the English version of Windows into Korean.

DEFENDANT'S SENTENCING MEMORANDUM – Page 11
No. 2:21-cr-00135-RAJ

**CORR CRONIN** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Joon was determined to excel.  He worked extremely long hours and his Microsoft co-workers admired his skill and dedication.  One co-worker, Han Kim, describes Joon's work at Microsoft as follows:

> Localization includes not only translating all the user interface to Korean but also localizing the code to meet Korean market requirements.  Joonmo had worked more than 80 hours a week to resolve all the outstanding issues. There were only 2 localizers in our team. One member didn't do a due diligence, which resulted in Joonmo's extra work but I've never seen him complaining about having more work and always wanted to step up and help the whole Korean team.  There had been a couple of days per week where Joonmo spent night in the office to meet the deadlines. I even worried how long he could keep long hours of work.  During casual coffee break, he convinced me how much he enjoyed his work.  Eventually, he didn't allow any tiny spelling or grammar error. His passion and strong desire to make a better Windows contribute to successful release of Korean Windows on time.  He is sincere, transparent and goes by the rule all the time.

**Exhibit C**, *Letter of Han Kim* at 1.

Despite the demanding launch schedule for the Korean version of Windows, Joon regards the successful completion of that project as one of the greatest accomplishments of his life. His former colleague Min Jung Lee vividly remembers these days with Joon:

> I remember when we worked together on releasing the beta version of Windows XP Korean version. We stayed late in the office to review localized versions of Windows XP to make sure it meets the highest quality bar. It wasn't a mandatory task nor asked by our management but Joonmo and I really wanted to release the best ever Korean version of Windows XP, thus we volunteered to review and test localized Windows XP. Close to the release date, we stayed up all night working then went to a 24 hrs restaurant to have breakfast. The pancakes that we had on that day were the best I ever had. We both were deadly tired but the feeling of satisfaction for working so hard to achieve the goal made everything so great and I'm sure Joonmo felt the same way. We often talked about those days as one of the best memories of our lives.

**Exhibit D**, *Letter of Ming Jung Lee* at 1.

Microsoft recognized Joon's dedication, skill, and hard work, and, in 1999, offered him a full-time position.  Ted Chong, the colleague who recommended Joon for a full-time position

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

at Microsoft, described the qualities that caught his eye and the kind of co-worker and man he

found Joon to be:

> During Joon's work at Microsoft as a contractor, I've seen him working with great
> passion and dedication, so I went ahead referred Joon a full-time position at Microsoft.
> He got hired after the referral and continued working at Microsoft as full-time employee,
> contributed to developing multiple software products released to public.
>
> ***
>
> Joon was always a delight to be around. Whether it was collaborating on
> projects, playing basketball in one of the courts on campus, or going out for
> meals, Joon was always a friendly, supportive, and loyal friend and co-worker.
> Early in our careers, we both translated Windows from English to Korean. His
> Korean linguist skill was always better than my own as I immigrated to the
> United States at a very young age. I often sought his advice and help to translate
> text that I found difficult. Korean has many nuances, and sometimes finding the
> right tone or word is challenging. Working for a company that created a
> competitive work environment, I felt blessed to have a friend who I could trust
> for advice and help.

***Exhibit E***, *Letter of Ted Chong* at 1.

Joon's Microsoft years were the happiest years of his life. Like many tech workers (and

workers in general), his job was his life. When he lost his job in 2017 during a "strategic

downsizing," the impact he felt was catastrophic. *See* Section F, below.

**D.  Joon's Marriage and Family Life**

Not long after Joon experienced success working for Microsoft, Joon experienced

success in his personal life as well. In 2001, he married a woman named Jeong-Ju who he first

met as a teenager in Seoul. *See PSR* at ¶ 63. Dr. Woods interviewed Jeong-Ju when evaluating

Joon. He states that Joon and Jeong-Ju "were well matched. They were both shy with histories

of depression. They both favored speaking in their native tongue of Korean. They are deeply

in love and support one another completely." ***Exhibit A*** at 8.

DEFENDANT'S SENTENCING MEMORANDUM – Page 13
No. 2:21-cr-00135-RAJ

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900



Joon and Jeong-Ju

Even before Joon was laid off from Microsoft, the couple faced a number of other setbacks and heartbreaks. Both Joon and Jeong-Ju deeply wished to be parents. Sadly, that was not to be. *See PSR* at ¶ 66. Dr. Woods reports that "[a]s the couple struggled to conceive a child, Joon stood by his wife and supported her. During their fertility struggles, Jeong-Ju described crying every day. In the interview, she stated that the depression she experienced was the worst she had felt in her life, yet Joon was there for her every day." *Id*.

In 2005, Joon's father was diagnosed with cancer in Korea. To visit his father, Joon used all of his paid and unpaid vacation time—he had accumulated a significant amount because he rarely, if ever, went on vacation. *See PSR* at ¶ 67. Joon tried to bring his father to the United States so he could take care of him here. On the day his father was supposed to travel to the United States, his father collapsed and fainted at the airport. His cancer had spread to his spine. Joon's father eventually passed away in Korea. "When his father died of cancer in 2005, Joon was crushed and overwhelmed. He sought mental health care through his primary care

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

2

provider, who prescribed antidepressants.  He has been taking them ever since as prescribed by two subsequent primary care providers." *Exhibit A* at 9; *see also PSR* at ¶ 68

3

**E.  In 2014, A Tragic Accident Forever Changes Joon's and Jeong-Ju's Lives**

4

5

6

7

In 2014, Joon and Jeong-Ju vacationed in Ocean Shores, Washington, to celebrate Jeong-Ju's 40th birthday.  For fun, they rented mopeds to explore the town.  Jeong-Ju tested her moped in a parking lot.  As she took off, the bike's brakes failed and she crashed at high speed into a parked minivan.

8

9

10

11

12

13

14

Jeong-Ju suffered permanent severe injuries in the accident.[3]  *See PSR* at ¶ 70.  Her leg and hip were broken, she underwent an extensive surgery, and she now has a titanium rod and bolts in her leg.  Jeong-Ju was bed-ridden for two months following the accident and it took four-months before she could walk again.  To this day she requires a cane to walk and her leg pain is steady and unremitting. Because of her disability, Jeong-Ju relies extensively on help from Joon to perform everyday tasks:

15

16

17

18

19

20

21

22

Although it has been 7 years since the accident, I am still suffering from aftereffect of accident and surgeries. I became a person who carries around disabled parking permit which I never imagined I would become one. I haven't been able to run nor walk for a long distance, sit for a long period of time. I still can't lift heavy things, cannot reach high shelves, cannot even push wheeled garbage bins. I am still depending on various medicines in order to handle daily tasks and manage physical/mental pains.  My husband has been a selfless helping person again, helping me with anything I need, providing help with daily chores, as well as continuous emotional support, making me to have hopes to live a normal, healthy life again. He keeps me from looking into my problems but to look up to brighter hopes and makes me to continuously exercise to improve my physical condition. If I didn't have my husband's help and support, both mentally and physically, I would not have pulled through these difficult years.

23

*Exhibit F, Letter of Jeong Ju Jeon* at 2.

24

---

[3] *See* **Exhibit F**.

DEFENDANT'S SENTENCING MEMORANDUM – Page 15
No. 2:21-cr-00135-RAJ

In his report, Dr. Woods assesses Joon's support for his disabled wife. He notes that in addition to taking over all the daily household chores, Joon manages her medications, and drives her everywhere because she is unable to drive herself far distances. ***Exhibit A*** at 8, 9. She is, in every sense of the word, dependent on him. *See PSR* at ¶ 70. Jeong-Ju's dependency has had a profound psychological effect on Joon, which was particularly acute after he was laid off by Microsoft. Dr. Woods describes this effect and how, coupled with the constellation of other psychological factors he discusses, it contributed to the commission of the offense in this case.

> Caregiver Burden is a little discussed, yet pervasive component of illness and disability. With the loss of their economic base [i.e. his job at Microsoft], Joon's caregiver burden became even more extensive and extreme. The term "caregiver burden" was first conceptualized around people providing care for those with cancer. It was then broadened to encompass anyone who carries the responsibility of providing for someone, suffering from a physical or psychological injury. . . .

> At the time Joon engaged in the activity that resulted in the charges to which he has pled, he was dealing with his wife's ongoing physical injury, the loss of his job of twenty (20) years, and his own lifelong depression. There is no question his long history of depression played a critical role in his impaired decision making. When his brother, whom he trusted and obeyed more than anyone, offered him financial advice, he accepted it. At the time, Joon was not able to effectively weigh and deliberate his decision. He understands that now and is very remorseful for his actions.

*Exhibit A* at 9.

**F. Joon Loses His Job at Microsoft (2015-2017)**

In 2015, Microsoft began to reorganize its entire international Windows department, including the Korean localization team, and in 2017 the reorganization cost Joon his job. It is difficult to over-estimate the havoc this layoff wreaked in Joon's life. Gone was his salary. Gone was his health care insurance. Jeong-Ju was not able to work due to her disability, so

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

gone, too, was his disabled wife's health care insurance.  Gone was the job that gave him

purpose, self-esteem, and social interaction.  *See PSR* at ¶ 72.

Even in this stressful time Joon responded with concern for his co-workers.  When a

colleague asked Joon why he was not seeking other jobs within Microsoft, he stated that he did

not wish to compete with his colleagues. There is no doubt Joon's desire not to compete with

his colleagues deterred him from seeking another job within Microsoft, but there was another

equally compelling reason: He believed the effort to be hopeless.

> As his team was about to be dismissed, his colleague, Minjun Lee, encouraged
> him to apply for other positions within Microsoft, as many of his coworkers
> were doing.  Joon said that he would look for positions later because he did not
> want to compete with his colleagues.  His response reflected a selflessness that
> Ms. Lee noted.  It is also indicative of something more basic – his fear that his
> English language deficits would make him unable to find other work at
> Microsoft.

> When he began to look for work outside of Microsoft, his search was limited to
> international companies that required foreign language expertise.  His fears
> around his English language deficits paralyzed him.

*Exhibit A* at 7.

As Dr. Woods confirms in his report, Joon's loss of his job took him to a very dark and

existential place.  He was convinced that he would once again be destitute and impoverished,

reduced to begging in a land that was not his own and where he was not fluent in the dominant

language.  He felt responsibility not just for himself, but for his wife, whose care weighed

heavily upon his shoulders.

It was this very particular and unique set of circumstances that led Joon to commit this

crime.  As will be discussed below, his crime was not motivated by greed—to the contrary, it

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

was motivated by the very real and very pathological fear that (like his parents before him) he would not be able to carry out his basic responsibilities to his family.

### G. Joon Begins to Day Trade to Generate Income and Support His Wife

Joon's older brother, Sung, aware of Joon's impending layoff and Joon's related fear of falling back into poverty, suggested that Joon begin trading stocks on the side as a way to generate some income. With mounting concerns over losing his salary, his health insurance, and his ability to financially care for his disabled wife, Joon took his older brother's advice, as he had done since childhood. *See PSR* at ¶ 71. Joon found that he liked learning about the stock market. He traded conservatively, based on technical indicators and chart patterns he had taught himself to understand.

At the same time that he began day-trading, Joon tried to find other employment, but he received no offers. It was at this scary and uncertain time in Joon's life that his brother suggested Joon trade Netflix options on the basis of subscription number information Joon's brother had access to as a Netflix employee. *Id*. at ¶ 15.

At first, Joon was dubious that day trading with this information from his brother could be profitable. Though a relative newcomer to stock trading, Joon had taught himself enough to know nothing was guaranteed in the stock market and that even good company news could trigger negative price movement. Ultimately, however, for the myriad and complex reasons detailed in Dr. Woods' report to the Court, Joon started trading Netflix stock on inside information his brother provided.

DEFENDANT'S SENTENCING MEMORANDUM – Page 18
No. 2:21-cr-00135-RAJ

**Corr Cronin llp**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

**H. Aftermath and Future**

No matter what his motivation was, Joon knows that what he did was wrong. He admits with great remorse that when he traded, he selfishly did not think of other people or realize his actions harmed others. *See PSR* at ¶ 31. Since then, he has done a great deal of internal reflection, as his earnest letter to the Court makes plain.

> More upsetting and sad fact is that, even after learning the lessons by losing $600k and stopped trading Netflix, I still didn't fully understand illegal aspect of my actions. When FBI agents visited my home August 2020, I didn't understand that they were investigating my crime. I believed they were investigating the people I've been trading stocks with. I was that much ignorant and selfish about my actions.
>
> ***
>
> I also now understand that I could be a person who I never thought I could be – a person who harm other people for my own gain, when cornered by bad life events. I learned from my horrible mistakes that I need to be a lot more careful not to become that horrible person again, when life situations are not perfect.

*Exhibit G, Letter of Joon Jun* at 2.

Joon's remorse and desire to accept responsibility for his actions are sincere and compelling. *See PSR* at ¶ 32. Joon never contested his guilt.[4] Instead, shortly after being contacted by the FBI in August 2020, he met with the federal government on two occasions and voluntarily submitted to lengthy interviews in which he answered every question posed to him. Joon has also deposited the entire restitution amount of $1,106,208.78 in his lawyer's trust

---

[4] Consistent with Joon's desire to accept full responsibility for his actions, in addition to acknowledging the Netflix trades that were made based on material non-public information Joon also acknowledged to the government his involvement in trading Chegg, Inc. and Tableau Software shares, even though these trades were for de minimis sums (less than $4,000) and far removed from the alleged tipper.

DEFENDANT'S SENTENCING MEMORANDUM – Page 19
No. 2:21-cr-00135-RAJ

account so that he will be ready to immediately remit this amount to the government when so ordered.

Joon's extraordinary remorse is reflected in other objective sources. For instance, after interviewing Joon for two hours during his presentence interview, Amelia Whaley wrote in her Presentence Report that "Mr. Jun's remorse was genuine and deep; it was clear that he has spent a significant amount of time considering his behavior and its impact on his family, the court, and the community." *See PSR* at ¶ 32. Joon has lived his life quietly, diligently, and with respect for those around him—often in a selfless, generous manner, as the many letters of support to the Court attest. The harm he caused others in this instance is the antithesis of his otherwise lifelong exemplary conduct, his character, and his beliefs.

Joon's criminal conviction has spurred significant and genuine introspection. He has been forced to critically examine his own faults. *See PSR* at ¶ 74. Joon acknowledges the negative triggers that ultimately caused him to act out of desperation and survival in a manner that was harmful to others. He realizes his potential vulnerabilities and this self-awareness has, in an important way, given him strength to forge a different path going forward.

Joon understands his conviction presents an opportunity to better himself. *See PSR* at ¶ 75. Joon's desire now is to be of service to others and follow in the footsteps of his missionary friend, Mrs. Kim, who he credits with saving his life. This goes beyond mere words to a judge, as Joon has already taken meaningful and concrete steps towards that goal. Over the past year Joon has dedicated many hours to earn a certification to counsel youths and adolescents, and he hopes to put that training to use going forward in his life. *See **Exhibits H, I**.*

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

Joon has also reflected on his unhealthy relationship with money.  Prior to this incident, due to his impoverished childhood, Joon was wracked with anxiety that the economic bottom would fall out of his life at a moment's notice.  *See PSR* at ¶ 31 and 32.  This led him to obsess about his financial security and behave selfishly, even though he is not fundamentally a selfish person.  Joon and his wife now tithe generously to the church and make a point of donating to others who are less fortunate than himself.

Most importantly, Joon now approaches each day with a renewed sense of gratitude.  It is true that since August 2020 Joon's life has been completely upended by the consequences of his criminal behavior—but it is also true that he is now an even better person.  *See PSR* at ¶ 75. He appreciates the opportunities life has provided him, and looks forward to a future that is centered on his wife and the church community that has been one of the true constants since he arrived here in 1991.

### III. RECOMMENDED SENTENCE

We respectfully recommend a term of probation for three years with six months of home confinement with electronic monitoring.

### IV. JUSTIFICATION FOR SENTENCING RECOMMENDATION

This Court has been sentencing defendants for nearly thirty years, and undersigned counsel is well aware that when this Court sentences a defendant, it endeavors to impose a sentence that is "'sufficient, but not greater than necessary, to comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017) (quoting 18 U.S.C. §

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

3553(a)).  We respectfully submit that a three-year probationary sentence with 6 months of home confinement is a just sentence for this man and these facts.

## A.   Rehabilitation

Joon has already made remarkable progress towards acknowledging his failings and rehabilitating himself.   While awaiting sentencing Joon has flawlessly complied with his release conditions and maintained a responsive, respectful relationship with his probation officer, Benjamin Beetham.

A defendant who knows he or she did wrong is a better candidate for rehabilitation that a defendant who steadfastly refuses to accept responsibility or insists his or her conviction is unfair.  Here, as the Probation Office noted, Joon "has clearly demonstrated acceptance of responsibility for the offense."  PSR ¶ 42.  Moreover, Joon's recognition of his guilt was not delayed, but immediate.  He took responsibility for his actions when the FBI knocked on his door in August 2020; then, post-arrest, Joon voluntarily cooperated with the government, submitting to two separate interviews with the DOJ and the FBI.  He answered all of the government's questions and provided all information in his possession that the government requested.[5]

---

[5] The Government's claim that Joon "deleted critical evidence from his cloud drive" following his meeting with the FBI is an extremely inaccurate mischaracterization of the actual facts. Dkt. no. 115 at 4. It is true that after the FBI left his house, Joon, in a panic, deleted a single options-trading calculator on a Microsoft Excel program. It is also true that the only reason the government knows about this deletion is because Joon quickly regretted it and voluntarily disclosed it when he met with the government a short time later.  Moreover, the calculator contained no information (critical or otherwise)--the calculator was a tool whose sole function was to receive a mathematical input and produce a mathematical output. The government fails to acknowledge that Joon did not delete anything else, including *actual* critical information like texts, phone records, chat histories, trading histories and all other electronic correspondence in his possession.  Joon preserved this evidence and offered to produce it to the Government, but the government never followed up. And why would it? Joon freely confessed to what he did, and the government did not require or request further computer

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Joon has spent significant time reflecting on how his past life has affected his present and future lives, but Joon's path to rehabilitation is paved with more than mere reflection.  He has put his recovery into action, and has now become an accredited youth counsellor.[6]  He believes his own painful experiences as a teen silently suffering depression may give him insights that will help other teens facing depression.

Joon's rehabilitation manifests in his treatment of other people as well.  As Joon's wife notes, the conviction has caused them both to examine and appreciate what they have been given in life:

> One thing both of us were surprised to see was we started having more sympathetic eyes to other people. We had eyes looking down on homeless people asking for money. We used to discuss that "They speak English better than us, why don't they work? They must be drug addicts and lazy people" Now we have more sympathetic eyes to them, understanding maybe they are going through some life situations no one would be able to know. A few months ago, while driving, we saw a homeless lady, who held a sign for help on one hand, her the other hand was holding her baby. Looking at this homeless lady, we both were sobbing in our car, and ended up donating what we had in our wallet. The money we donated was not much, but more important thing was that we both were surprised to see ourselves; how we changed going through this rough time together.

**Exhibit F***, Letter of Jeong Ju Jeon at 3.*

The court has undoubtedly seen financial fraud cases in which the defendant commits fraud to feed the pursuit of more: more cars, more houses, more boats, more money.  In those cases, incarceration may serve the purpose of rehabilitation by forcing the defendant to reckon with and reform the greedy and avaricious impulses that led to the crime.

---

evidence.  Joon regrets deleting the tool—but the deletion caused no harm (and the Government is wrong to suggest it did).

[6] *See* **Exhibit H, I**.

DEFENDANT'S SENTENCING MEMORANDUM – Page 23
No. 2:21-cr-00135-RAJ

**CORR CRONIN** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

This is not such a case. Joon did not commit this crime because he was greedy, or to pay for mansions and fancy vacations. Joon committed this crime because he was deathly afraid that without the job and steady income that had centered him for twenty years, he and his wife would return to the poverty he thought he had escaped. Joon realizes that was a terrible mistake, but it is a mistake he has recognized and taken steps to correct. Prison would not serve a rehabilitation purpose here.

## B.    Deterrence and Protection of the Public

For a number of reasons, Joon's case does not present deterrence or protection of the public concerns, rendering a prison sentence unnecessary. First, with the exception of this conviction, Joon has no criminal record whatsoever. Countless studies (and, of course, this Court's long experience) suggest that criminal history is correlated with recidivism risk.[7] Having experienced the enduring pain and shame of his first encounter with the criminal justice system, Joon is committed to returning (and in fact has returned) to the crime-free life he led before this incident.

A common theme in Joon's letters of support is the total shock by friends and family that Joon had committed this crime and Joon's complete compunction. His life-long friend, Jay Lee, writes:

---

[7] *See* Kevin I. Minor et. al., *Recidivism Among Federal Probationers-Predicting Sentence Violations*, Fed. Probation 31, 35 (2003) ("Similarly, younger persons and individuals with prior felony or misdemeanor convictions were significantly more likely to violate probation, and this is in line with past research as well."); *see also* Melissa Hamilton, Back to the Future: The Influence of Criminal History on Risk Assessments, 20 Berkeley J. Crim. L. 75, 89–90 (2015) ("Studies somewhat consistently show that prior offense history is predictive of future reoffending."); *see also* Jessica M. Eaglin, Constructing Recidivism Risk, 67 Emory L.J. 59, 83 (2017) ("Tool creators decide which predictive factors observed in the statistical model will be included in the resulting actuarial risk tool. Generally, risk assessment tools include four different categories of predictive factors: criminal history, anti-social attitude, demographics, and socioeconomic status.")

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

The news regarding his case came to me as a big surprise. He had often shared his devastated heart, while he witnessed his colleagues and friends being managed out one by one at Microsoft. When it was finally his turn to be laid off after devoting 20 years of his life, I remember how he had decided to provide for his family through stock market investments.

Joon Mo had broken contact during the last year or so despite many expressions of concern on my part. When he finally reached out to me as well as other friends, he not only explained why he was unable to communicate with us but also shared with us his regret and remorse over his actions.

Your honor. Joon Mo has been as family to me and is one of my lifetime best friends. As someone who has known him for most of my life, I attest to the fact that he is not one who would knowingly deceive others and wantonly disregard the law in pursuit of his self-interest. I am certain that given the opportunity Joon Mo will seize upon it to build a stronger foundation for a better life, having learn from his errors.

**Exhibit J**, *Letter of Jay Lee* at 1-2.

Joon's childhood friend, Yun Ho Jeong, of over thirty-years' details his dear friend's conduct is utterly uncharacteristic from the Joon he knows:

Your Honor. Joon Mo I know is a truly compassionate and empathetic person who cares for others. He is a person who will sacrifice himself to help others, as he did to me. I dare not claim his innocence in all this. But I can say that he has been an honest, law abiding person(who never drives fast in fear of braking the speed limit) and is definitely not one to intentionally mastermind a grand scheme. Joon Mo was a kind of a person that never wanted to trouble others in any way. He was a person who always felt sorry when he asked an easy favor to others but always ready and willing to sacrifice when he is helping others. He has always been a true Christian full of consideration towards his brothers and sisters. I pray that he may not be judged too harshly for one single instance of bad judgement.

**Exhibit K**, *Letter of Yun Ho Jung* at 2-3.

A three-year probationary period with six months' home detention and a seven-figure forfeiture adequately protects the public and will deter Joon and others from criminal conduct. A harsher sentence is not required.

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

**C.     A Three Year Probationary Sentences With Six Months Home Detention Is a Just Sentence.**

For many reasons, six months' home detention, coupled with three-years of probation, is a "just sentence" that satisfies § 3553.  First, the proposed sentence takes into account Joon's history of severe depression and other serious medical conditions.  This history is well-documented in Dr. Wood's thorough report, which describes Joon's depression and the impact it had on his offense.  *See PSR* at ¶ 81 and 82.

Second, a home detention sentence would enable Joon to take care of his wife, who is severely disabled, and has no other means of support.  A prison sentence would impose an extreme harm upon Joon and his wife, and while such harms may be an unavoidable element of any custodial sentence, it is reasonable for the Court to decide that the imposition of such harms are not necessary in a case like this, in which the § 3553 factors may be satisfied by a non-custodial sentence.

Third, a home detention sentence takes into account the fact that many securities fraud cases are not met with criminal prosecution at all, but are instead subject only to SEC civil penalties.[8]  The government has sought to justify its sentencing recommendations in this case

---

[8] *See* e.g. *Securities and Exchange Commission v. Ken C. Chow*, et al., (Case No. C-01-21067 JW) (N.D. Cal. Filed Nov. 2001) (Nvidia employee traded on employer's announcement that it had been awarded a contract with Microsoft); *see also Securities and Exchange Commission v. David M. Otto, Todd Van Siclen*, et al., Civil Action No. 2:09-cv-0960 RAJ (W.D. Wash. filed July, 2009) (Attorneys conspired to create a "pump and dump" scheme by using a false and misleading public relations campaign); *see also Securities and Exchange Commission v. Kenneth Peer*, No. 2:17-cv-01865 (W.D. Wash. filed Dec., 2017) (Therapist of a Zulily employee traded on acquisition news received from his patient during a confidential counselling session); *see also Securities and Exchange Commission v. Kirk Sperry and Sperry and Sons Capital Investments, LLC*, No. 2:20-cv-01337 (W.D. Wash. filed Sept., 2020) (Investment company defrauded investors by making false, misleading statements regarding a real estate investment project); *Securities and Exchange Commission v. Angela Milliard et al.*, Civil Action No. 12-73-M-DLC (D. Montana filed May, 2020) (Paralegal at semiconductor company learned of acquisition and tipped father).

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

by comparing them to other criminal securities fraud cases.  That analysis is far too narrow, as it ignores the many securities fraud cases that never see prosecution at all, and are instead brought exclusively by the SEC (and sometimes not brought at all).  It is reasonable for the Court to take these cases into consideration when imposing sentence, and to recognize that in facing criminal prosecution, Joon already occupies the far side of the punishment spectrum.

**D.  The Recommended Sentence is in Accord with the Sentences This Court Has Already Imposed in This Case**

A three-year probation/six months' home detention sentence would fall between the 14-month sentence imposed upon Jun Woo Chon, and the one-year probation sentence imposed upon Ayden Lee.  This is as it should be, and provides further evidence that the recommended sentence is a "just sentence."

Joon is clearly more culpable than Ayden Lee, who did not profit from any Netflix trading and was to some degree unwittingly lured into the scheme by Sung-Mo Jun.  However, Joon is clearly less culpable than Jun Woo Chun.  Consider:

- Jun Woo Chun's trading profits were $1,640, 641—over $500,000 more than Joon's profits.
- Joon's trades were motivated not by greed, but by a job loss, economic instability and his fear that he could not provide for his family.  In contrast, Jun Woo made his trades even though he was (a) employed; (b) worth $6 million dollars at the time of the trades; and (c) had recently inherited $1 million dollars.  As the Court pointed out during sentencing, Jun Woo's trades were the product of greed; Joon's were not.
- When first contacted in August 2020, Jun Woo lied to the FBI; Joon did not.
- Post-arrest, both Joon and Jun Woo Chon cooperated with the government.

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

- Joon's behavior was influenced by personal challenges beyond his control (depression, childhood poverty) that are entirely absent from Jun Woo's background.

Given these material differences, it would be unfair for both men to receive the same or similar sentences.  A three-year probationary sentence with six months' home confinement sets a proper balance between the sentence imposed upon Jun Woo Chon and the sentence imposed upon Ayden Lee.

## V. CONCLUSION

> How we treat those who have made mistakes speaks to who we are as society and is a statement about our values--about our dedication to fairness, equality, and justice, and about how to protect our families and communities from harm, heal after loss and trauma, and lift back up those among us who have earned a chance at redemption.

Barack Obama, *The President's Role in Advancing Criminal Justice Reform*, 130 Harv. L. Rev. 811, 865–66 (2017).

Joon Jun has earned a chance at redemption.  He pleaded guilty to one count of insider trading, voluntarily cooperated in related criminal investigations, consented to judgment in a parallel SEC proceeding, and placed his entire forfeiture amount ($1,106,208.78) in escrow to repay the United States for the losses suffered by his conduct.  His offense, while not excusable, is explainable.  It was not motivated by greed, but by a complex mix of circumstances, conditions, and events as described above and in Dr. Woods's report to the Court.  Joon's emotional, heart-felt, letter to the Court expresses his sincere remorse more powerfully than counsel could ever hope to do.  His contrition was evident to the Probation Department as well.  *See PSR* at ¶ 32.  While awaiting sentencing, he has made significant personal strides to put his life back on the right path—the path his life had always taken

DEFENDANT'S SENTENCING MEMORANDUM – Page 28
No. 2:21-cr-00135-RAJ

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1  except for this one regrettable detour—by earning a certification to counsel troubled and

2  depressed children and adolescents.  And the many letters to the Court from his community of

3  friends, co-workers, and loved ones reflect his otherwise exemplary life, character, and

4  conduct.

5      Our system should seek to avoid incarceration when it has the ability to achieve the

6  legitimate goals of criminal sentencing without imposing a sentence of imprisonment.  Here, it

7  is difficult to see how a prison sentence would serve those legitimate goals. Given the

8  significant mitigating evidence Joon has presented, his profound remorse, the important role he

9  plays as caregiver for his disabled wife at home, his full payment of forfeiture, and the extreme

10 unlikelihood that he is a risk to reoffend, we respectfully ask the Court to impose a sentence of

11 six-months of home detention with three years' probation.

12     DATED this 25th day of March, 2022.

CORR CRONIN LLP


 *s/ Steven W. Fogg*
Steven W. Fogg, WSBA No. 23528
Todd T. Williams, WSBA No. 45032
Byung-Hee Keum, WSBA No. 57174
1001 Fourth Avenue, Suite 3900
Seattle, Washington  98154
(206) 625-8600 Phone
(206) 625-0900 Fax
sfogg@corrcronin.com
twilliams@corrcronin.com
dkeum@corrcronin.com

*Attorneys for Defendant Joon Jun*

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on March 25, 2022, I electronically filed the foregoing with the

3  Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

4  following:

5
   Justin Wells Arnold                        Harold Malkin
6  United States Attorney's Office            Henry Phillips
   700 Stewart Street, Suite 5220             Calfo Eakes LLP
7  Seattle, WA  98101-1271                    1301 Second Avenue, Suite 2800
   justin.arnold@usdoj.gov                    Seattle, WA 98101
8  *Assistant US Attorney, Plaintiff USA*     HaroldM@calfoeakes.com
                                              HenryP@calfoeakes.com
9                                             *Attorneys for Defendant Sung Mo Jun*

10
   Chris Black                                Carleen R Arlidge
11 Black & Askerov PLLC                       Law Office of Carleen R Arlidge
   705 Second Avenue, Suite 1111              111 North Market Street, Suite 300
12 Seattle, WA 98104                          San Jose, CA 95113
   chris@blacklawseattle.com                  craatty@aol.com
13 *Attorneys for Defendant Junwoo Chon*      *Attorneys for Defendant Ayden Lee*

14
   David R. Callaway                          Neil Martin Fox
15 Goodwin Proctor LLP                        Law Office Of Neil Fox
   601 Marshall Street                        2125 Western Avenue, Suite 330
16 Redwood City, CA 94063                     Seattle, WA 98121
   DCallaway@goodwinlaw.com                   nf@neilfoxlaw.com
17 *Attorneys for Defendant Ayden Lee*        *Attorneys for Defendant Ayden Lee*

18

19      DATED:   March 25, 2022.

20                                 *s/ Steven W. Fogg*
                                   Steven W. Fogg, WSBA No. 23528
21                                 1001 Fourth Avenue, Suite 3900
                                   Seattle, Washington  98154
22                                 (206) 625-8600 Phone
                                   (206) 625-0900 Fax
23                                 sfogg@corrcronin.com
                                   *Attorneys for Defendant Joon Jun*
24

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900